Slip Op. 17-89

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SUNPOWER CORPORATION ET AL., | |
| **Plaintiff and Consolidated Plaintiffs,** | |
| and | |
| CANADIAN SOLAR INC. ET AL., | |
| **Plaintiff-Intervenors and Consolidated Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| v. | **Consol. Court No. 15-00067** |
| UNITED STATES, | |
| **Defendant,** | |
| and | |
| SOLARWORLD AMERICAS, INC., | |
| **Defendant-Intervenor and Consolidated Defendant-Intervenor.** | |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's remand determination in the antidumping and countervailing duty investigations of certain crystalline silicon photovoltaic products from the People's Republic of China.]

Dated: July 21, 2017

Daniel Joseph Gerkin, Vinson & Elkins, LLP, of Washington, DC, argued for plaintiff SunPower Corporation.  With him on the brief was Jerome J. Zaucha, K&L Gates, LLP, of Washington, DC.

Craig Anderson Lewis, Hogan Lovells US LLP, of Washington, DC, argued for consolidated plaintiffs Shanghai BYD Co., Ltd. and BYD (Shangluo) Industrial Co., Ltd. Diana Dimitriuc-Quaia, Arent Fox LLP, of Washington, DC, argued for consolidated plaintiffs and plaintiff-intervenors Canadian Solar Inc., Changzhou Trina Solar Energy

Co., Ltd., China Sunergy (Nanjing) Co., Ltd., China Solar (Zhejiang) Co., Ltd., ET Solar Industry Ltd., Hefei JA Solar Technology Co., Ltd., Jinko Solar Co., Ltd., LDK Solar Hi-Tech (Nanchang) Co., Ltd., Perlight Solar Co., Ltd., ReneSola Jiangsu Ltd., Shanghai JA Solar Technology Co., Ltd., Shenzhen Sacred Industry Co., Ltd., Shenzhen Sungold Solar Co., Ltd., Sumec Hardware & Tools Co., Ltd., Sunny Apex Development Ltd., Wuhan FYY Technology Co., Ltd., Wuxi Suntech Power Co., Ltd., Zhongli Talesun Solar Co., Ltd., Znshine PV-Tech Co., Ltd.  With her on the brief were John Marshall Gurley and Julia L. Diaz.

Neil R. Ellis, Richard L.A. Weiner, Brenda A. Jacobs, and Rajib Pal, Sidley Austin LLP, of Washington, DC, for plaintiff-intervenors Yingli Green Energy Holding Co., Ltd., and Yingli Green Energy Americas, Inc.

Tara Kathleen Hogan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel on the brief was Scott McBride, Assistant Chief Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance.

Timothy C. Brightbill, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor SolarWorld Americas, Inc.  With him on the brief was Laura El-Sabaawi.

Kelly, Judge:   Before the court is the U.S. Department of Commerce's ("Commerce" or "Department") remand determination in the antidumping and countervailing duty investigations of certain crystalline silicon photovoltaic products from the People's Republic of China ("PRC" or "China"), filed pursuant to the court's order in SunPower Corp. v. United States, 40 CIT __, 179 F. Supp. 3d 1286 (2016) ("SunPower").[1] See Final Results of Redetermination Pursuant to Court Order, Oct. 5, 2016, ECF No. 105-1 ("Solar II PRC Remand Results").  For the reasons set forth below, Commerce has

---

[1] This consolidated action was originally assigned to Judge Donald C. Pogue, who remanded in SunPower on June 8, 2016.  See SunPower, 40 CIT at __, 179 F. Supp. 3d at 1308.  On November 18, 2016, pursuant to USCIT Rule 77(e)(4) and 28 U.S.C. § 253(c) (2012), the case was reassigned following Judge Pogue's death.  Order of Reassignment, Nov. 18, 2016, ECF No. 114.  Oral argument was held on April 28, 2017.  See Oral Arg., Apr. 28, 2017, ECF No. 130.

complied with the court's order in <u>SunPower</u>, 40 CIT at __, 179 F. Supp. 3d at 1308, and

Commerce's conclusions are supported by substantial evidence and in accordance with

law.  Commerce's remand determination is therefore sustained.

## BACKGROUND

The court assumes familiarity with the facts of this case as discussed in the

previous opinion, <u>see</u> <u>SunPower</u>, 40 CIT at __, 179 F. Supp. 3d at 1289–93, and here

recounts the facts relevant to the court's review of the Solar II PRC Remand Results.

This case concerns an antidumping duty ("ADD") investigation and a countervailing duty

("CVD") investigation of certain solar products from the People's Republic of China

("China" or "PRC") which is intrinsically related to an ADD investigation and CVD

investigation of certain crystalline silicon photovoltaic cells ("solar cells" or "cells") from

the PRC and an ADD investigation of certain solar cells from Taiwan.  An overview of all

three sets of investigations[2] is warranted to contextualize the current proceeding.

Initially, Commerce investigated the solar industry in China on the basis of a

petition from domestic producer SolarWorld Americas, Inc. ("SolarWorld"), Defendant-

Intervenor here, alleging dumping activity and countervailable subsidies injurious to the

domestic solar industry ("the Solar I PRC investigations").  <u>Crystalline Silicon Photovoltaic</u>

<u>Cells, Whether or Not Assembled Into Modules, From the [PRC]</u>, 76 Fed. Reg. 70,960

(Dep't Commerce Nov. 16, 2011) (initiation of ADD investigation); <u>Crystalline Silicon</u>

<u>Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC]</u>, 76 Fed.

---

[2] For clarification, the three sets of investigations are: i) the Solar I PRC ADD and CVD investigations; ii) the Solar II PRC ADD and CVD investigations; and iii) the Solar II Taiwan ADD investigation.

Reg. 70,966, 70,967 (Dep't Commerce Nov. 16, 2011) (initiation of CVD investigation).

The Solar I PRC investigations resulted in ADD and CVD orders covering solar cells from

China, including Chinese cells assembled into modules, laminates, and panels outside of

China; these orders did not cover solar modules, laminates, or panels assembled in China

using solar cells produced outside of China.  See Crystalline Silicon Photovoltaic Cells,

Whether or Not Assembled Into Modules, From the [PRC], 77 Fed. Reg. 73,018 (Dep't

Commerce Dec. 7, 2012) (amended final determination of sales at less than fair value

and ADD order); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into

Modules, From the [PRC], 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (CVD

order) ("the Solar I PRC Orders").  Although the Solar I PRC Orders covered both solar

cells and modules, laminates, and/or panels containing solar cells, Commerce

determined that the solar cell is the origin-conferring component.  See Issues and

Decision Mem. for the Final Determination in the [ADD] Investigation of Crystalline Silicon

Photovoltaic Cells, Whether or Not Assembled into Modules, from the [PRC], A-570-979,

5–9 (Oct. 9, 2012), available at http://ia.ita.doc.gov/frn/summary/prc/2012-25580-1.pdf

(last visited July 18, 2017) ("Solar I PRC ADD Final Decision Memo"); Issues and Decision

Mem. for the Final Determination in the [CVD] Investigation of Crystalline Silicon

Photovoltaic Cells, Whether or Not Assembled Into Modules, from the [PRC], C-570-980,

77–81 (Oct. 9, 2012), available at http://ia.ita.doc.gov/frn/summary/prc/2012-25564-1.pdf

(last visited July 18, 2017) ("Solar I PRC CVD Final Decision Memo").  Further, using a

substantial transformation analysis, Commerce determined that assembly of solar cells

into modules, laminates, and/or panels in a third country did not change the country of

origin of the merchandise.[3]  Solar I PRC ADD Final Decision Memo at 5–6; Solar I PRC

CVD Final Decision Memo at 77–78.   Thus, solar modules, laminates, and panels

assembled in a third country using Chinese solar cells are covered by the Solar I PRC

Orders, while solar modules, laminates, and panels assembled in the PRC using non-

Chinese solar cells are not covered.  See Solar I PRC Orders.

Subsequently, SolarWorld petitioned Commerce to initiate additional proceedings

related to the Chinese and Taiwanese solar industry.  Pet. for Imposition of [ADD] and

[CVD] Investigation, Certain Crystalline Silicon Photovoltaic Products from the [PRC] and

Taiwan, ADD PD 1–8, bar codes 3171232-01–08 (Dec. 31, 2013); Pet. for Imposition of

[ADD] and [CVD] Investigation, Certain Crystalline Silicon Photovoltaic Products from the

[PRC] and Taiwan, CVD PD 1–8, bar codes 3171278-01–08 (Dec. 31, 2013)  ("Solar II

PRC and Taiwan Petition").[4]  SolarWorld claimed ongoing injury to the domestic solar

---

[3] Commerce applied a "substantial transformation analysis" in the Solar I PRC investigation to ascertain the origin of the solar panels.  Using this analysis,

> the Department found that solar cells are the "essential active component" that define the module/panel  and that stringing third- country solar cells together and assembling them with other components into a module in the PRC does not constitute substantial transformation  such that the assembled module could be considered a product of the PRC.

Solar I PRC ADD Final Decision Memo at 6; Solar I PRC CVD Final Decision Memo at 77–78.  In its substantial transformation analysis, Commerce considers: 1) whether the processed downstream product falls into a different class or kind of product when compared to the upstream product, 2) whether the essential component of the merchandise is substantially transformed in the country of exportation, and 3) the extent of processing.  See, e.g., Certain Crystalline Silicon Photovoltaic Products from Taiwan: Issues and Decision Mem. for the Final Determination of Sales at Less than Fair Value, A-583-853, 19 (Dec. 15, 2014), available at http://ia.ita.doc.gov/frn/summary/taiwan/2014-30107-1.pdf (last visited July 18, 2017).

[4] On July 7, 2015, Defendant submitted indices to the public and confidential administrative records for the ADD and CVD investigations, which identify the documents that comprise the

industry, alleging that the Chinese solar industry had, in response to the <u>Solar I PRC</u> <u>Orders</u>, shifted from the assembly of modules, laminates, and panels (or "panels") using Chinese cells to the assembly of panels in China using non-Chinese cells.  <u>Id.</u> at 3–6 (stating that the <u>Solar I PRC Orders</u> "failed to cover Chinese solar modules assembled from non-Chinese solar cells, allowing Chinese solar producers to begin using cells fully or partially manufactured in Taiwan in the modules they assembled for export to the United States, and to export those modules, duty-free, to the U.S. market.").  At the same time, the petition alleges that imports of solar cells and panels from Taiwan increased as well, causing material injury to the domestic industry.  <u>See id.</u> at 2–7.  On the basis of this petition, Commerce initiated a second ADD and CVD investigation of the Chinese solar industry and an ADD investigation of the Taiwanese solar industry.  <u>Certain Crystalline</u> <u>Silicon Photovoltaic Products from the [PRC] and Taiwan</u>, 79 Fed. Reg. 4,661 (Dep't Commerce Jan. 29, 2014) (initiation of ADD investigations) ("<u>Solar II PRC and Taiwan</u> <u>ADD Initiation Notice</u>"); <u>Certain Crystalline Silicon Photovoltaic Products from the [PRC]</u>, 79 Fed. Reg. 4,667 (Dep't Commerce Jan. 29, 2014) (initiation of CVD investigation) ("<u>Solar II PRC CVD Initiation Notice</u>").

These investigations resulted in two sets of orders.  The investigation into the Chinese solar industry resulted in an ADD order and a CVD order covering modules, laminates, and/or panels assembled in China consisting of cells manufactured outside of

---

public and confidential administrative records to Commerce's final determination.  The indices to these administrative records can be located at ECF No. 32.  All further references to documents from the administrative records are identified by the numbers assigned by Commerce in these administrative records.

China, including cells manufactured in Taiwan. Certain Crystalline Silicon Photovoltaic Products from the [PRC], 80 Fed. Reg. 8,592 (Dep't Commerce Feb. 18, 2015) (ADD order; and amended final affirmative CVD determination and CVD order) ("the Solar II PRC Orders"). The investigation into the Taiwanese solar industry resulted in an ADD order covering solar cells manufactured in Taiwan,[5] including Taiwanese cells assembled into modules, laminates, and/or panels outside of Taiwan, but excluding Taiwanese cells assembled into modules, laminates, and/or panels in China covered by the Solar II PRC Orders.[6] Certain Crystalline Silicon Photovoltaic Products from Taiwan, 80 Fed. Reg. 8,596 (Dep't Commerce Feb. 18, 2015) (ADD order) ("the Solar II Taiwan Order").[7]

---

[5] Petitioner did not file a CVD petition with respect to subject imports from Taiwan. See Solar II PRC and Taiwan Petition at 19.

[6] The Solar II Taiwan Order is the subject of litigation as well. See SunEdison, Inc. v. United States, 40 CIT __, 179 F. Supp. 3d 1309 (2016); Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V. v. United States, 41 CIT __, Slip Op. 17-__ (July __, 2017). SunEdison linked these cases:

> Because the final Solar II Taiwan scope incorporates the Solar II PRC exception for solar panels assembled in China–which exempts all such panels from the otherwise generally applicable rule that the origin of solar panels is determined by the origin of their constituent cells–these same concerns are also implicated here. Accordingly, Commerce's final Solar II Taiwan scope determination must be remanded for the same reasons as those elaborated in the court's prior opinion, to ensure that the agency's approach in these proceedings is consistent.

SunEdison, Inc., 40 CIT at __, 179 F. Supp. 3d at 1321–22.

[7] Therefore, although the Solar I PRC Orders, Solar II PRC Orders, and Solar II Taiwan Order resulted from three separate sets of investigations, they are intrinsically related. The Solar II PRC Orders cover Chinese-assembled modules, laminates, and panels consisting of cells from any country but China. The Solar II Taiwan Order, on the other hand, parallels the Solar I PRC Orders, focusing on the location of the cells' manufacture; however, the Solar II Taiwan Order excludes Taiwanese cells assembled into panels in China, as those panels are within the scope of the Solar II PRC Orders.

The Solar II PRC Orders are at issue in this case.  The Solar II PRC Initiation

Notices stated that the

> merchandise covered by these investigations is crystalline silicon
> photovoltaic cells, and modules, laminates and/or panels consisting of
> crystalline silicon photovoltaic cells, whether or not partially or fully
> assembled into other products, including building integrated materials. For
> purposes of these investigations, subject merchandise also includes
> modules, laminates and/or panels assembled in the subject country
> consisting of crystalline silicon photovoltaic cells that are completed or
> partially manufactured within a customs territory other than that subject
> country, using ingots that are manufactured in the subject country, wafers
> that are manufactured in the subject country, or cells where the
> manufacturing process begins in the subject country and is completed in a
> non-subject country.
> . . .
> [E]xcluded from the scope of these investigations are any products
> covered by the existing antidumping and countervailing duty orders on
> crystalline silicon photovoltaic cells, whether or not assembled into
> modules, from the People's Republic of China.  See [Solar I Orders].

Solar II PRC and Taiwan ADD Initiation Notice, 79 Fed. Reg. at 4,667; Solar II PRC CVD

Initiation Notice, 79 Fed. Reg. at 4,671.  The preliminary determination, published on July

24, 2014, contained identical scope language.  See Decision Mem. for the Prelim.

Determination in the [ADD] Investigation of Certain Crystalline Silicon Photovoltaic

Products from the [PRC], A-570-010, 4–5, ADD PD 698, bar code 3217803-01 (July 24,

2014); Decision Mem. for the Prelim. Affirmative Countervailing Determination in the

[CVD] Investigation of Certain Crystalline Silicon Photovoltaic Products from the [PRC],

C-570-011, 4–5, CVD PD 267, bar code 3206936-01 (June 2, 2014).

The proposed scope for the Solar II PRC investigations included language which

Commerce and the parties referred to as "the two out of three rule."  This language

provided that

> subject merchandise also includes modules, laminates and/or panels
> assembled in the subject country consisting of crystalline silicon
> photovoltaic cells that are completed or partially manufactured within a
> customs territory other than that subject country, using ingots that are
> manufactured in the subject country, wafers that are manufactured in the
> subject country, or cells where the manufacturing process begins in the
> subject country and is completed in a non-subject country.

See, e.g., Solar II PRC CVD Initiation Notice, 79 Fed. Reg. at 4,671.  Defendant explained

that this language was referred to as the "two-out-of-three rule" because "a product would

qualify as subject merchandise if it contained Chinese input (ingots, wafers, or partially

manufactured cells) and assembly of the module occurred in China," even if the cell was

manufactured or completed in a third country.  Def.'s Opp'n Mots. J. Admin. R. 7 n.5, Feb.

9, 2016, ECF No. 78 ("Def.'s Resp.").

Following publication of the preliminary results, on October 3, 2014, Commerce

notified interested parties of a proposed revision of the scope language in an attempt to

address concerns about administration and enforcement of the "two-out-of-three rule."[8]

[ADD] and [CVD] Investigations of Certain Crystalline Silicon Photovoltaic Products from

the [PRC] and the [ADD] Investigation of Certain Crystalline Silicon Photovoltaic Products

---

[8] Commerce explained the administration and enforcement concerns with the "two-out-of-three rule":

> the Department found that the two-out-of-three scope language originally
> proposed by Petitioner would not be administrable, given that certain parties
> reported that they did not track where the ingots, wafers, or partial cells used in
> third-country cells being assembled into modules in the PRC were produced, and
> that it would be "virtually impossible" for importers to have that information.
> Additionally, in light of the history of evasion under the Solar I PRC Orders and the
> undisputed "complex and readily adaptable global supply chain," the Department
> found that the two-out-of-three scope language would permit further evasion and
> ultimately incomplete relief.

Solar II PRC Remand Results at 22–23 (quoting Solar II PRC ADD Final Decision Memo at 13,
14, n.45; Solar II PRC CVD Final Decision Memo at 38, 40, n.215).

from Taiwan: Opportunity to Submit Scope Comments, ADD PD 765, bar code 3233173-01 (Oct. 3, 2014); [ADD] and [CVD] Investigations of Certain Crystalline Silicon Photovoltaic Products from the [PRC] and the [ADD] Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments, CVD PD 349, bar code 3233174-01 (Oct. 3, 2014).   The revision altered the scope to cover all modules, laminates, and/or panels assembled in China consisting of solar cells produced in a country other than China.  Id. at 1–2.

On December 23, 2014, Commerce published the final determinations in the Solar II PRC ADD and CVD investigations.  Certain Crystalline Silicon Photovoltaic Products from the [PRC], 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) (final determination of sales at less than fair value) ("Solar II PRC ADD Final Results") and accompanying Issues and Decision Mem. for the Final Determination of Sales at Less than Fair Value, A-570-010, (Dec. 15, 2014), ECF No. 32-6 ("Solar II PRC ADD Final Decision Memo"); [CVD] Investigation of Certain Crystalline Silicon Photovoltaic Products from the [PRC], 79 Fed. Reg. 76,962 (Dep't Commerce Dec. 23, 2014) (final affirmative CVD determination) ("Solar II PRC CVD Final Results") and accompanying Issues and Decision Mem. for the Final Determination in the [CVD] Investigation of Certain Crystalline Silicon Photovoltaic Products from the [PRC], C-570-011, (Dec. 15, 2014), ECF No. 32-11 ("Solar II PRC CVD Final Decision Memo").   Commerce implemented the revised scope language from the October 3, 2014 letter, removing the "two-out-of-three rule" and modifying the scope language to cover all modules, laminates, and/or panels assembled in the PRC consisting of non-Chinese solar cells:

> The merchandise covered by this investigation is modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials. For purposes of this investigation, subject merchandise includes modules, laminates and/or panels assembled in the PRC consisting of crystalline silicon photovoltaic cells produced in a customs territory other than the PRC.
> . . .
> . . . [E]xcluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates and/or panels, from the PRC.

Solar II PRC ADD Final Decision Memo at 4; Solar II PRC CVD Final Decision Memo at 3–4.  Commerce determined that, for purposes of the Solar II PRC Orders, country of origin would be determined by the country in which the assembly of the panel occurred (i.e., China, for all covered products).[9]  Solar II PRC ADD Final Decision Memo at 15–16; Solar II PRC CVD Final Decision Memo at 41.  Commerce dispensed with a substantial transformation analysis, finding that "a rote application of a substantial transformation analysis would not allow the Department to address unfair pricing decisions and/or unfair subsidization concerning the modules that is taking place in the country of export."  Id.; see Solar II PRC Remand Results at 6.  Commerce explained that its determination was based on

> (1) the unique nature of the solar products industry in light of the readily adaptable supply chain and record evidence of a shift in trade flows following the implementation of the Solar I PRC Orders; (2) the Department's concerns that the scope language in the Petitions would be neither administrable nor enforceable, and could invite further evasion of

---

[9] Specifically, Commerce explained that, "[w]ith the scope clarification we have adopted for the PRC investigation, the PRC is the country of origin of all modules, laminates and/or panels assembled in the PRC that contain crystalline silicon photovoltaic cells produced in a customs territory other than the PRC."  Solar II PRC ADD Final Decision Memo at 16; Solar II PRC CVD Final Decision Memo at 41.

> any resulting order; and (3) the fact that the Department needed a
> mechanism to address the alleged injury to the domestic industry, which
> stemmed, in relevant part, from modules assembled in the PRC using third-
> country solar cells, and which would not be captured by a traditional
> substantial transformation analysis.

Solar II PRC Remand Results at 6.   In the concurrent Solar II Taiwan investigation,

however, Commerce, as it had in the Solar I PRC investigations determined that the solar

cell is the origin-conferring input, reverted to a substantial transformation analysis, and

determined that panel assembly does not substantially transform the cell into a different

product for purposes of that investigation.[10]  See Certain Crystalline Silicon Photovoltaic

Products from Taiwan: Issues and Decision Mem. for the Final Determination of Sales at

Less   Than   Fair   Value,   A-583-853,   18–23   (Dec.   15,   2014),   available   at

http://ia.ita.doc.gov/frn/summary/taiwan/2014-30107-1.pdf  (last  visited  July  18,  2017)

("Solar II Taiwan Final Decision Memo").

On March 18, 2015, Plaintiff SunPower Corporation ("SunPower") commenced this

action.  Summons, Mar. 18, 2015, ECF No. 1; see Am. Summons, Mar. 25, 2015, ECF

No. 13.  SunPower moved for judgment on the agency record, SunPower Corporation's

Rule 56.2 Mot. J. Agency R., Oct. 5, 2015, ECF No. 60, challenging Commerce's final

determination on the grounds that the agency unlawfully and unreasonably expanded

_____

[10] However, Taiwanese solar cells assembled into modules, laminates, or panels in the PRC are
excluded from the scope of the Solar II Taiwan Order, "to address the concerns expressed in the
Petition, i.e., to prevent evasion of the [Solar I PRC Orders] and to close the 'loophole' alleged by
the Petitioners, and in light of the Department's scope determination in the concurrent PRC AD[D]
and CVD investigations."  Certain Crystalline Silicon Photovoltaic Products from Taiwan: Issues
and Decision Mem. for the Final Determination of Sales at Less Than Fair Value, A-583-853, 23
(Dec. 15, 2014), available at http://ia.ita.doc.gov/frn/summary/taiwan/2014-30107-1.pdf (last
visited July 18, 2017).

the scope of the petition to include modules and panels assembled in China from cells

manufactured outside of China.  See Br. Supp. SunPower Corporation's Rule 56.2 Mot.

J. Agency R. 10–25, Oct. 5, 2015, ECF No. 60 ("SunPower Br.").  Specifically, SunPower

argued that Commerce's scope alteration in the final determination impermissibly

expanded the scope beyond the scope stated in the petition, id. at 10–13; was

inconsistent with the agency's prior practice for determining country of origin in similar

proceedings, and departed from that practice without sufficient explanation, id. at 13–21;

and deprived parties of procedural due process. Id. at 21–24.  SunPower also requested

the court to ensure that the final scope of the Solar II PRC Orders applied only to subject

merchandise that entered on or after publication of the antidumping duty order on

February 18, 2015, or on or after publication of the final determination on December 23,

2014. Id. at 24.

On June 8, 2016, the court remanded the final determination for Commerce to

reconsider or further explain its scope determination in the Solar II PRC Orders, because

the court determined that

> Commerce's final scope determinations departed from the agency's prior
> rule for determining national origin for solar panels without adequate
> consideration or discussion of the continuing relevance, if any, of
> Commerce's prior factual finding that the assembly of imported solar cells
> into panels is insufficient to change the product's country-of-origin from the
> country of cell-production to the country of panel-assembly.

SunPower, 40 CIT at __, 179 F. Supp. 3d at 1288–89.  The court ordered that Commerce

further consider and explain what appeared to be: (1) its departure from its prior practice

of using a single country of origin test for a particular class or kind of merchandise; (2)

Commerce's dissimilar treatment of similarly situated merchandise; and (3) Commerce's

departure from its prior practice of calculating normal value using the market where the majority of production of the subject merchandise took place.  Id., 40 CIT at __, 179 F. Supp. 3d at 1298–1308.  The court deferred consideration of Plaintiff's request that the court "prevent the retroactive application" of the revised scope language in the Solar II PRC Orders to entries made prior to the publication of the final Solar II PRC Orders.[11] Id., 40 CIT at __, 179 F. Supp. 3d at 1308.  On June 14, 2016, the court remanded the final determination in the Solar II Taiwan investigation "for consistency with, and based on the same reasoning as" its remand order in SunPower, SunEdison, Inc. v. United States, 40 CIT __, __, 179 F. Supp. 3d 1309, 1312 (2016), as "[b]oth cases concern the rules of origin for solar panels manufactured from Taiwanese cells" such that the issues in the two cases are "inextricably entwined."  Id., 40 CIT at __, 179 F. Supp. 3d at 1312– 13.

On October 5, 2016, Commerce published the Solar II PRC Remand Results.  On remand, as requested by the court, Commerce provided explanation of its determinations in the Solar II PRC and Solar II Taiwan investigations.  See Solar II PRC Remand Results

---

[11] SunPower also resolved several arguments raised by the parties.  Specifically, the court determined that Plaintiffs were not deprived of due process by Commerce's modification of the scope in the final determination, as the parties had, and would continue to have on remand, opportunity to raise their scope arguments; the court accordingly declared the due process challenge "moot."  SunPower, 40 CIT at __, 179 F. Supp. 3d at 1296.  Further, the court determined that the final Solar II PRC Orders did not cover different merchandise than the merchandise investigated in the ADD and CVD proceedings.  Id.  Finally, the court held that Commerce did not unlawfully expand the scope of the Solar II PRC investigations beyond the intent in the petition, emphasizing Commerce's authority "to modify the proposed scope as necessary to best effectuate the Petitioner's intent while ensuring that any resulting AD[D]/CVD orders are properly administrable and enforceable, based on a reasonable reading of the record and consistent with applicable legal requirements and principles."  Id., 40 CIT at __, 179 F. Supp. 3d at 1297.

at 2–31.  Commerce explained that it has the authority to modify the scope language from the initiation of the investigation to the issuance of the ADD or CVD order, see id. at 12–18, and that "[t]he class or kind of merchandise defined in a petition may not be exactly the same class or kind of merchandise ultimately subject to a countervailing or antidumping duty order."  Id. at 12.  Commerce explained that it applied a substantial transformation test in the Solar II Taiwan investigation, id. at 25–26, in which it determined that cells are not substantially transformed by the process of panel assembly and thus that the cell is origin-conferring, see Solar II Taiwan Final Decision Memo at 18–21, but that, due to the specific pricing behaviors in the Solar II PRC investigations, Commerce applied a different origin rule for purposes of these investigations.  See Solar II PRC Remand Results at 22–28.  Commerce also explained that Taiwanese cells assembled into panels in Taiwan are excluded from the Solar II Taiwan Order, to avoid subjecting a product to two orders.  Id. at 40–42.

SunPower challenges the remand determination.  See Comments of Pls. SunPower Corporation and SunPower Corporation, Systems on Final Results of Redetermination Pursuant to Court Order, Oct. 27, 2016, ECF No. 110.  Specifically, SunPower challenges the Solar II PRC Remand Results on the grounds that Commerce unlawfully created two country of origin rules for products within the same class or kind of merchandise, id. at 4–6; that Commerce impermissibly departed from a substantial transformation analysis in the Solar II PRC investigations, id. at 6–13; and that Commerce insufficiently explained its departure from a substantial transformation analysis in the Solar II PRC investigations.  Id. at 13–14.

**STANDARD OF REVIEW**

The court has jurisdiction pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012)[12] and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of a countervailing duty order.  "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'"  Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

**DISCUSSION**

In SunPower, the court remanded to Commerce for further consideration and explanation of: (1) Commerce's apparent departure from its prior practice of using a single country of origin test for a particular class or kind of merchandise; (2) Commerce's dissimilar treatment of similarly situated merchandise; and (3) Commerce's departure from its prior practice of calculating normal value using the market where the majority of production of the subject merchandise took place.  SunPower, 40 CIT at __, F. Supp. 3d at 1298–1308.  The court deferred consideration of the argument that Commerce applied

---

[12] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

the Solar II PRC Orders to entries made prior to the publication of the final Solar II PRC Orders.  40 CIT at __, F. Supp. 3d at 1308.  The remanded and deferred issues are addressed in turn.

## A. The Class or Kind of Merchandise

The court remanded to Commerce to explain its deviation from its prior policy of applying only one rule of origin to a single class or kind of merchandise, based on the court's assumption that solar panels were a single class or kind of merchandise.[13] SunPower, 40 CIT at __, 179 F. Supp. 3d at 1298–1308.  Relatedly, the court asked Commerce to explain how it could treat similarly situated products within the same class or kind of merchandise—solar panels consisting of non-Chinese solar cells—differently depending upon the country of panel assembly.  Id., 40 CIT at __, F. Supp. 3d at 1302–07.

On remand, Commerce explained its use of different origin rules in the Solar II PRC and Solar II Taiwan investigations.  Commerce stated that, contrary to the court's assumption, the Solar II PRC Orders and Solar II Taiwan Order (as well as the Solar I

---

[13] The court found that "Commerce provides two separate grounds for this determination [to apply a different rule of origin in Solar II PRC]: (1) addressing circumvention of the Solar I PRC orders; and (2) addressing assembly-specific Chinese government subsidies. Neither is sufficient." SunPower, 40 CIT at __, 179 F. Supp. 3d at 1304.  The court went on to state that

Commerce does not explain why either of its rationales provides a sufficient basis for disregarding Commerce's prior factual findings regarding the relative insignificance of panel assembly in determining country-of-origin. Nor does Commerce explain why either ground provides a sufficient basis for applying AD[D]/CVD duties to the entire value of panels that are assembled in China from non-Chinese cells, thereby failing to consider and explain an important aspect of the problem.

Id.

PRC Orders) covered different classes or kinds of merchandise.  Solar II PRC Remand

Results at 16–17.  Therefore, Commerce did not apply different origin rules to the same

class or kind of merchandise; it applied different origin rules to different classes or kinds

of merchandise.  See id. at 22, 26.  For the reasons that follow, on remand Commerce

has sufficiently explained that its country-of-origin analysis does not constitute application

of two rules of origin to a single class or kind of merchandise.

　　　　The statute and case law instruct that the term "class or kind of merchandise" refers

to the products within a particular proceeding.  The term "subject merchandise" is

statutorily defined as "the class or kind of merchandise that is within the scope of an

investigation, a review, a suspension agreement, an order under this subtitle or section

1303 of this title, or a finding under the Antidumping Act, 1921."  19 U.S.C. § 1677(25).

This definition of subject merchandise provides that the scope of a proceeding establishes

the "class or kind of merchandise."  Because the statute refers to the "class or kind of

merchandise" that is within the scope, one must look to the scope itself to find the

parameters of the "class or kind of merchandise."  Precedent from the Court of Appeals

for the Federal Circuit supports an interpretation of "class or kind of merchandise" as

proceeding-specific.  See Target Corp. v. United States, 609 F.3d 1352, 1363 (Fed. Cir.

2010) (noting, in the context of later-developed goods not specifically excluded in the

order, that "[t]he kind or class of merchandise encompassed by a final antidumping order

is determined by the order," citing Smith Corona Corp. v. United States, 915 F.2d 683,

685 (Fed. Cir. 1990) (explaining that "[t]he class or kind of merchandise encompassed by

a final antidumping order is determined by the order," in affirming the holding that certain

portable electronic typewriters with text memory, developed after the final order covering

"all portable electronic typewriters," were within the covered class or kind of merchandise

and were thus within scope)).  It would be illogical for "class or kind of merchandise" to

be defined by an order and simultaneously refer more broadly to products outside of or

beyond a certain proceeding.  A product not subject to a proceeding is therefore not of

the same class or kind of merchandise as products that are subject to the proceeding,

regardless of physical similarities.[14]

On remand, in response to the court's assumption that it had applied different

origin rules to the same class or kind of merchandise, Commerce explained that, pursuant

to the statutory framework, the term "class or kind of merchandise" refers to the products

covered within a particular proceeding.[15]  See Solar II PRC Remand Results at 12–22.

---

[14] Orders often specify exclusions.  See, e.g., Issues and Decision Mem. for the Administrative Review of the [ADD] Order on Diamond Sawblades and Parts Thereof from the [PRC], A-579-900, 3 (Jun. 6, 2017), available at http://ia.ita.doc.gov/frn/summary/prc/2017-12106-1.pdf (last visited July 18, 2017); Issues and Decision Mem. for the Final Results and the Partial Rescission of the 2014–2015 [ADD] New Shipper Reviews: Multilayered Wood Flooring from the [PRC], A-570-970, 3 (May 26, 2017), available at http://ia.ita.doc.gov/frn/summary/prc/2017-11560-1.pdf (last visited July 18, 2017); Issues and Decision Mem. for Certain Cased Pencils from the [PRC]: Final Results of [ADD] Administrative Review; 2014–2015, A-570-827, 2 (May 22, 2017), available at  http://ia.ita.doc.gov/frn/summary/prc/2017-11053-1.pdf  (last visited  July  18,  2017).   Since "class or kind of merchandise" refers to the merchandise that is the subject of the order, and an order can have exclusions, it would be illogical to assume that "the class or kind of merchandise" is a static, predefined type of merchandise.

[15] Commerce also noted that the legislative history supports an understanding of the phrase "class or kind of merchandise" as subject merchandise.  Solar II Taiwan Remand Results at 20.  In implementing the Uruguay Round Agreements Act of 1994, Congress modified the Tariff Act of 1930 to render certain statutory provisions consistent with the language of the WTO Antidumping Agreement and Agreement on Subsidies and Countervailing Measures.  See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. No. 103-316 (1994).  In adopting the term "subject merchandise," Congress explained:

(footnote continued)

Commerce stated that the solar products covered by the <u>Solar II PRC Orders</u> therefore are not and could not be within the same class or kind of merchandise as the products covered by the <u>Solar II Taiwan Order</u>:

> the Department did not apply conflicting country-of-origin analyses to a "single" class or kind of merchandise. The Department initiated investigations (Solar I, Solar II PRC, and Taiwan Solar) into three different classes or kinds of merchandise, independently analyzed the country-of-origin of the products at issue in each, and ultimately issued final determinations as to three different classes or kinds of merchandise which, as is reflected in the Orders themselves, cover different products.

Solar II PRC Remand Results at 16. Commerce explained that "class or kind of merchandise" does not refer to a "general 'type of product,' not restricted by the merchandise specifically described as within, and limited by, the scope of the AD[D] and CVD orders." <u>Id.</u> at 35. According to Commerce, as the <u>Solar II PRC Orders</u> and <u>Solar II Taiwan Order</u> cover products within two distinct classes or kinds of merchandise, the agency did not apply two rules of origin to products within the same class or kind of merchandise.[16] <u>See</u> <u>id.</u> at 22, 26.

---

> What formerly was referred to as the "class or kind" of merchandise subject to investigation or covered by an order is now referred to simply as the "subject merchandise." The substitution of terms from the Agreement is not, in itself, intended to affect the meaning ascribed by administrative and judicial interpretation to the replaced terms.

<u>Id.</u> at 4,161.

[16] Commerce also emphasized that the statute allows for an evolution in the class or kind of subject merchandise from the initial investigation to the final order. Solar II PRC Remand Results at 34–35. Commerce explained that, during the investigation, the "class or kind of merchandise" is governed by the words of the petition; once an order is published, the "class or kind of merchandise" is defined by the language of the order, and accordingly the "class or kind of merchandise" described in the final determination of an investigation may not be "identical to that upon which the Department initiated the investigation." <u>Id.</u> at 34.

On remand Commerce has sufficiently explained the basis for the two distinct rules of origin it applied in the Solar II PRC and Solar II Taiwan investigations.  As the harm alleged and ultimately confirmed in the Solar II PRC investigations was specific to solar panels that had been assembled in China, it was reasonable for Commerce to determine that the appropriate country-of-origin for subject merchandise within that investigation was the country of panel assembly.  At the same time, the harm alleged and ultimately confirmed in the Solar II Taiwan investigation was specific to the manufacture of solar cells in Taiwan; it accordingly was reasonable for Commerce to determine that the appropriate country-of-origin for subject merchandise within that investigation was the country of cell manufacture.  The differing rules of origin appear reasonably tailored to cover the particular solar products at issue in the two sets of investigations, and reflect the particular injurious activity discovered in each investigation.  Based on this understanding of the term "class or kind of merchandise" as applicable to products within a particular proceeding, the concern expressed by the  court that Commerce applied more than one country-of-origin rule to products within the same class or kind of merchandise necessarily dissipates.  The solar panels covered by the Solar II PRC Orders are not within the same class or kind of merchandise as the solar panels covered by the Solar II Taiwan Order.

## B.  Similarly Situated Products

A related but distinct issue is the court's concern that Commerce treated similarly situated products differently in the Solar II PRC proceeding than in the Solar II Taiwan proceeding.  See SunPower, 40 CIT at __, 179 F. Supp. 3d at 1302–07.  In the Solar II

PRC investigations, Commerce assessed ADD and CVD liability based on pricing and

subsidization behavior in the country of panel assembly and, in the Solar II Taiwan

investigation, consistent with prior practice Commerce assessed ADD liability based on

pricing behavior in the country of cell manufacture.  See id., 40 CIT at __, 179 F. Supp.

3d at 1302–03.  The court expressed concern that, in so doing, Commerce "applied two

different rules to similarly situated products."  Id., 40 CIT at __, 179 F. Supp. 3d at 1303.

On remand, Commerce explained that, due to the particular circumstances present

in the Solar II PRC investigations, it sought to investigate different products than in the

Solar II Taiwan investigation (i.e., assembled solar modules, laminates, and/or panels

rather than solar cells), and it defined the scope in the Solar II PRC investigations

differently as a result.  See Solar II PRC Remand Results at 22, 27–28.  Thus, it reasons

that the products covered by the Solar II PRC Orders are not similarly situated to the

products covered by the Solar II Taiwan Order.  Id. at 27–28.  The Solar II PRC

investigations concern assembled panels while the Solar II Taiwan investigation concerns

solar cells.[17]  Commerce explained that it determined that China subsidizes the panel

assemblies and prices panels exported to the U.S. below the prices at which those

products are sold in China.  See id. at 51–52.  Therefore, the Solar II PRC investigations

and orders target panel assemblies while the Solar II Taiwan (and Solar I PRC)

investigations and orders target cells.  Because the Solar II PRC investigations focused

---

[17] However, as discussed above, solar cells manufactured in Taiwan and assembled into panels
in China are excluded from the scope of the Solar II Taiwan Order, to avoid overlapping coverage
as these cells are within the scope of the Solar II PRC Orders.  See Solar II PRC Remand Results
at 40–42; Solar II Taiwan Order; Solar II PRC Orders.

on allegations of injurious dumping activity and subsidization with respect to assemblies

within the PRC,[18] China was the country in which the activities that led to the injurious

behavior in those investigations occurred. Id. at 27–28. Commerce concluded that it was

therefore reasonable to focus on the pricing behavior within the country of assembly, in

order to fashion a remedy to address the particular injury alleged. Id. at 27–29, 45–47,

51–52. Commerce emphasized that the same circumstances were not present in the

Taiwan investigation, which drove its decision in that investigation to focus on pricing

behaviors within the country of cell manufacture.[19] Id. at 27–28. Thus, according to

---

[18] Specifically, in Solar II PRC, Commerce explained that:

> In these investigations, the alleged injury to the domestic industry stems from certain solar modules that are assembled in the PRC using cells produced in third countries, modules which are not covered by the scope of Solar I and, thereby, exceed the reach of the remedy afforded by the Solar I AD[D] and CVD orders. In addition, taking the instant PRC investigations together with Solar I, the Petitioner has alleged that the domestic industry is being injured as a result of the unfair pricing of cells produced in the PRC, modules containing such cells, and modules assembled in the PRC with third-country cells, as well as unfair subsidization in the PRC of both cells and modules.
>
> . . .
>
> . . . [T]here exist prior AD[D] and CVD orders on related merchandise (i.e., solar cells and modules) from the PRC – Solar I – and following the initiation of the Solar I investigations and the imposition of those orders, there has been a shift in trade flows that has resulted in increased imports of non-subject modules produced in China. Such imports – if they are dumped and/or unfairly subsidized and injurious – should not be beyond the reach of the AD[D] and CVD laws.

Solar II PRC ADD Final Decision Memo at 13; Solar II PRC CVD Final Decision Memo at 38–39.

[19] In the Solar II Taiwan investigation, Commerce concluded that, although Taiwanese cell production was injuring the U.S. industry, there were not similar concerns regarding evasion and panels assembled in Taiwan as were present in the Solar II PRC investigations:

> [A]lthough Petitioner has claimed that it wishes Taiwanese modules to be covered by the scope of this investigation, all facts it alleged with respect to the modification of the exporters' commercial activity to avoid the payment of duties under the Solar

(footnote continued)

Commerce, this is not an instance of arbitrary disparate treatment of similarly situated products; on the contrary, the disparate treatment is specific to the disparate conduct alleged in the petitions and discovered in the investigations, and is targeted in each proceeding to achieve an effective remedy.  See id.

Commerce provided a reasoned basis for its different approaches in the two different cases.  As discussed above, Commerce tailored the Solar II PRC investigations to address injurious pricing decisions for and subsidization of solar panels assembled in China using non-Chinese cells, and therefore reasonably constructed a country-of-origin rule that focused on that panel assembly.[20]  Commerce adequately explained that this deviation from prior practice was due to the circumstances in the Solar II PRC investigations that warranted a unique response in order to fashion a remedy for the injurious pricing behavior alleged and found.  Fashioning remedies based on the unique

---

I orders pertained to modules, laminates and panels using Taiwanese solar cellsand not solar modules assembled in Taiwan using third country cells. Furthermore, [Petitioner] did not provide evidence on the record that indicates that Taiwanese modules produced using third country cells are being dumped or used to evade the application of any existing AD[D] or CVD order. In fact, nearly all U.S. sales reported by the Taiwanese mandatory respondents were sales of solar cells, not sales of solar modules. . . Therefore, in light of our determination that the module assembly in Taiwan does not constitute substantial transformation, we have determined that the substantial evidence on the record does not support the inclusion of solar modules assembled in Taiwan using third country cells in the scope of this investigation.

Solar II Taiwan Final Decision Memo at 23.

[20] In SunEdison, the court addressed the argument that solar products that are further manufactured in a third country may not be included in the scope of the order absent a finding of circumvention pursuant to 19 U.S.C. § 1677j(b).  SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1319–20.  The court determined that 19 U.S.C. § 1677j(b) "applies to circumstances where an order with a defined scope is already in effect."  SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1319.  In the present case, it is not alleged that Commerce was required to address petitioner's circumvention concerns by using the anti-circumvention statute, 19 U.S.C. § 1677j.

circumstances present in the Solar II PRC and Solar II Taiwan investigations did not result in disparate treatment of similarly situated products; these products were situated differently, as Taiwanese cells assembled into panels in third countries are not subject to the subsidies and dumping behaviors present in the Chinese market.  Commerce has sufficiently explained the reasons for its disparate treatment of these solar products.  <u>Save Domestic Oil, Inc. v. United States</u>, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004) ("[I]f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom.").

### C.  Normal Value

The court sought further explanation or reconsideration from Commerce regarding its decision to base duty assessments on the Chinese market in the Solar II PRC investigations.  <u>SunPower</u>, 40 CIT at __, 179 F. Supp. 3d at 1305–07.  The court emphasized that Commerce did not consider whether comparing the Chinese price for the finished product to the U.S. export price constituted a "fair comparison" as required by statute, and that Commerce did not explain its deviation from its past practice of assessing antidumping and countervailing duty liability on the market of essential production.  <u>Id.</u>  The court remanded for Commerce to explain or reconsider this determination.[21]  <u>Id.</u> at 1307.

---

[21] The court stated that

> Commerce continued to hold, in Solar II Taiwan as in Solar I PRC, with respect to all solar cells except those assembled into panels in China, that analyzing the market where most of the essential production takes place, <u>i.e.</u>, the country of cell-

(footnote continued)

The statute requires that Commerce compare normal value (the price at which the subject merchandise sells in the country of export (i.e., home market)) and the export price (the price at which the subject merchandise sells in the U.S.).[22]  19 U.S.C. §§ 1673, 1677b(a).[23]  The statute instructs that, "to achieve a fair comparison" of the normal value and the export price,[24] normal value of the subject merchandise shall be determined by "the price at which the foreign like product is first sold . . . for consumption in the exporting country. . ."[25]  19 U.S.C. § 1677b(a)(1)(B).  Thus, a fair comparison is achieved when the

---

> production, is more important than basing the AD[D]/CVD analysis and liability on the market of the much less significant subsequent assembly step. Commerce does not square this circle in its rationale [in Solar II PRC].

SunPower, 40 CIT at __, 179 F. Supp. 3d at 1305.

[22] Pursuant to 19 U.S.C. § 1677b(a), to determine whether subject merchandise is being or is likely to be sold at less than fair value in the United States, "a fair comparison shall be made between the export price or constructed export price and normal value."  19 U.S.C. § 1677b(a).

[23] In SunPower, the court noted that "these problematic aspects of Commerce's Solar II PRC decision affect most directly the agency's AD[D], rather than its CVD, analysis," because the ADD statute requires Commerce to calculate normal value of the finished product on the basis of a single foreign market while the CVD statute does not contain a similar requirement.  SunPower, 40 CIT at __, 179 F. Supp. 3d at 1307–08; see 19 U.S.C. § 1671.  The court noted that, "[n]onetheless, Commerce has consistently held that, as with AD[D] liability, CVD liability must also be based on a single foreign market's subsidy analysis."  SunPower, 40 CIT at __, 179 F. Supp. 3d at 1308.

[24] Export price is the price at which the subject merchandise is sold (or agreed to be sold) before importation by the foreign producer or exporter to an unaffiliated purchaser in the United States or for exportation to the United States.  19 U.S.C. § 1677a(a).

[25] "Foreign like product" is defined as:

> merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

> (A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(footnote continued)

price at which the foreign like product is sold in the exporting country is compared to the price at which the subject merchandise is sold in or to the United States.

The subject merchandise, its physical attributes and its country of origin, is defined by the scope which is set by Commerce (e.g., widgets from China). Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1096–97 (Fed. Cir. 2002). To say that a product is "from China" necessarily raises the question of what it means to be "from" a country. Commerce often answers this question by using a substantial transformation test with reference to the merchandise described in the order; but Commerce can answer this question by using the words of the order or some other analysis. SunEdison, Inc., 40 CIT at __, 179 F. Supp. at 1320 ("Because the plain language of the antidumping statute does not unambiguously prescribe any specific approach to origin determinations, Commerce may exercise reasonable discretion in selecting a reasonable method for such determinations."); see also Duferco Steel, Inc., 296 F.3d at 1097.

---

(B) Merchandise--

(i) produced in the same country and by the same person as the subject merchandise,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise--

(i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16).

The origin established by Commerce, using a reasonable means it chooses, determines the relevant market for the purpose of assessing duty.  The country-of-origin establishes the country by which normal value is determined.  <u>See</u> 19 U.S.C. § 1677b(a)(1)(B).  Where Commerce employs a substantial transformation test, a test that looks to where the most essential manufacturing occurs, the comparison market will be the market where the essential manufacturing occurs.[26]  If Commerce chooses not to apply the substantial transformation test, the relevant market will be a function of the origin rule that Commerce chooses to apply instead.

Commerce explained that the statute does not require a fair comparison based on the country where most of the production occurs, requiring only that a fair comparison be made between normal value and export price.  <u>See</u> Solar II PRC Remand Results at 30–31.  Commerce emphasized that, pursuant to the statute, the agency must be able to, "where appropriate, address unfair pricing decisions or unfair subsidization that is taking place in the exporting country where further manufacturing, such as assembly, occurs, notwithstanding that such activities may not necessarily result in a substantial transformation of merchandise."  Solar II PRC ADD Final Decision Memo at 15; Solar II PRC CVD Final Decision Memo at 41.  Reasonably discernible from Commerce's explanation is that the proper market for normal value is not necessarily the market where

---

[26] Commerce's essential production test is a derivative of the substantial transformation test, in which Commerce considers, <u>inter alia</u>, whether the essential component of the merchandise is substantially transformed in the country of exportation.  <u>See</u>, <u>e.g.</u>, Certain Crystalline Silicon Photovoltaic Products from Taiwan: Issues and Decision Mem. for the Final Determination of Sales at Less than Fair Value, A-583-853, 18–19 (Dec. 15, 2014), <u>available at</u> http://ia.ita.doc.gov/frn/summary/taiwan/2014-30107-1.pdf (last visited July 18, 2017).

most of the production occurs.[27]  Rather, the proper market for normal value is the market

of origin as determined by Commerce's origin test in any given situation.  As discussed

above, in the Solar II PRC investigations, because the petitions alleged dumping and

subsidization activities during panel assembly within the PRC, and because Commerce

found that panels assembled in China using non-Chinese solar cells were being

subsidized in China and dumped in the United States, Commerce applied a country of

origin rule based on the country of panel assembly.  See Solar II PRC Remand Results

at 22–26.  Commerce explained that this focus on China as the location of "qualitatively"

significant production activity caused the agency to base normal value on the Chinese

market, "without regard to where the majority of production may have taken place."  See

id. at 28–31.

        Commerce has sufficiently explained why its methodology for determining normal

value is different in the Solar II PRC and Solar II Taiwan investigations.  For each order,

Commerce must identify the home market for the purpose of determining normal value.

The statute does not require Commerce to base normal value on the country of essential

production.  While Commerce looks to the country of essential production in the Solar II

Taiwan investigation, Commerce may deviate from prior practice as long as it explains

---

[27] It is reasonably discernible that Commerce's objective in choosing an origin test is to determine the country of export for purposes of ascertaining normal value.  It is also reasonably discernable that Commerce believes the substantial transformation test adequately identifies the relevant market for normal value when the objectionable pricing decisions relate to a particular component. The test identifies where that origin-conferring component was last transformed and the country of export/home market will be where that component last underwent a substantial transformation. However, when the objectionable pricing activities relate to a finished product, i.e., an assembled solar module, the substantial transformation test may not capture all the objectionable activities.

why doing so is justified under the circumstances.  Save Domestic Oil, Inc., 357 F.3d at 1283–84 ("[I]f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom.").  Here, the subject merchandise is solar modules, laminates, and/or panels assembled in the PRC, which are exported to the United States from China.  Pursuant to the statute, Commerce must compare the price at which the foreign like product is sold in the home market to the price at which the imported solar panels are sold in the United States.  Commerce did this here, and its assessment of antidumping duties based on normal value in China was therefore reasonable.

### D.  Retroactive application of the scope determination

Finally, in SunPower the court deferred consideration of SunPower's argument that "Commerce unlawfully applied the final Solar II PRC scope determinations to entries made prior to the publication of the AD[D] and CVD orders."[28]  SunPower, 40 CIT at __, 179 F. Supp. 3d at 1308.  SunPower argues that, should the court sustain Commerce's scope determination, the court should order that determination only applies prospectively. SunPower Br. 24 ("[S]hould the Court [affirm Commerce's final Solar II PRC scope determinations], the Court must prevent the retroactive application of the 'scope clarification' to entries made prior to the publication of the [ADD] order on February 18, 2015, or at least prior to the publication of [Commerce]'s final determination in the Federal Register on December 23, 2014.").

---

[28] This argument was also raised by former Consolidated Plaintiff Suniva, Inc.; however, Suniva, Inc. v. United States, Court No. 15-00071, was severed from the consolidated action and subsequently dismissed.  See Order, May 16, 2017, ECF No. 133.

SunPower does not point to anything that supports the implication that Commerce's order applies to merchandise entered prior to publication of the final antidumping duty order.  Defendant cites Commerce's instructions to U.S. Customs and Border Protection ("CBP") to suspend liquidation and collect cash deposits as of the date of publication of the Solar II PRC ADD Final Results and Solar II PRC CVD Final Results on December 23, 2014, and Commerce's subsequent instructions (adjusted to reflect subsidy offsets) to CBP to suspend liquidation and collect cash deposits as of the date of publication of the Solar II PRC ADD and CVD orders on February 18, 2015.  Def.'s Resp. 49–50.  Indeed, Commerce instructed CBP to suspend liquidation of, and collect cash deposits at the final rate for, subject merchandise within the final scope which was "entered, or withdrawn from warehouse, for consumption on or after 12/23/2014," the date of the publication of the Solar II PRC ADD Final Results.  See CBP Instructions Pertaining to Final ADD Determination, Message No. 5002303, A-470-010, ADD PD 833, bar code 3251068-01 (Jan. 2, 2015).  Commerce subsequently instructed CBP to suspend liquidation and collect ADD cash deposits at rates "adjusted to reflect the subsidy offsets determined in the companion [CVD] proceeding," as of February 18, 2015, the date of publication of the final ADD and CVD orders.  See CBP Instructions Pertaining to Interested Parties Order Instructions, Message No. 5051302, ADD PD 847, bar code 3271944-01 (Apr. 23, 2015).  Commerce instructed CBP to suspend liquidation and collect CVD cash deposits at the final subsidy rates, as of February 10, 2015, "the date of publication of the International Trade Commission's final determination in the Federal Register."  See CBP Instructions Pertaining to Interested Parties Amended Final and CVD

Order, Message No. 5051303, CVD PD 416, bar code 3261675-01 (Feb. 20, 2015).

SunPower states that, "if Defendant's position is that the expanded scope, as embodied

in the Department's scope 'clarification,' is not being applied to entries prior to the date of

the final determinations, we agree with the Defendant's position."   Reply Br. Pls.

SunPower Corporation and SunPower Corporation, Systems 21, Mar. 29, 2016, ECF No.

91.  That is Defendant's position.  See Def.'s Resp. at 49–50.  Accordingly, there is no

dispute to resolve with respect to this issue.

## CONCLUSION

For the foregoing reasons, the remand determination in the antidumping and

countervailing duty investigations of certain crystalline silicon photovoltaic products from

the People's Republic of China are found to comply with the court's order in SunPower,

40 CIT at __, 179 F. Supp. 3d at 1308, and the conclusions are supported by substantial

evidence and in accordance with law.  Judgment will enter accordingly.


                                              /s/ Claire R. Kelly
                                             Claire R. Kelly, Judge

Dated: July 21, 2017
         New York, New York